### No. 27962

**Purgatoire River Water Conservancy District, John Flood Ditch Company, El Moro Ditch Company, Baca Irrigating Ditch Company, Chilili Ditch Company, Picketwire Ditch Co., Inc., The Enlarged South Side Ditch Co., The Hoehn Ditch Company, Lewelling and McCormick Ditch Co., Salas Ditch Co., and The Burns and Duncan Ditch Co. — City of Trinidad and Model Land and Irrigation Company v. C. J. Kuiper, State Engineer, Robert W. Jesse, Division Engineer, Henry E. Marques, Water Commissioner — Highland Irrigation Company and Nine Mile Canal Co. — Amity Mutual Irrigation Company and The Fort Lyon Canal Company**

(593 P.2d 333)

Decided March 5, 1979.                    Rehearing denied April 16, 1979.

Davis, Graham & Stubbs, Clyde O. Martz, Howard L. Boigon, Stanley L. Grazis, for plaintiffs-appellants.

Moses, Wittemyer, Harrison & Woodruff, P.C., Raphael Moses, David L. Harrison, for intervenor-plaintiffs-appellants.

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, for defendants and cross claim defendants-appellees.

Vranesh, Raisch & Schroeder, P.C., Wayne B. Schroeder, for defendants and cross claimants-appellees.

Carl M. Shinn, for intervenor-defendant and cross claimant-appellee Amity Mutual Irrigation Company.

Lefferdink, Lefferdink & Stovall, John J. Lefferdink, for intervenor-defendants and cross claimant-appellee The Fort Lyon Canal Company.

James W. Moorman, Assistant Attorney General.

Peter R. Steenland, Jr., Maryann Walsh, Department of Justice, amicus curiae United States of America.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This proceeding relates to the administration of certain water rights by reason of the construction and operation of the Trinidad Project. We reverse.

The Trinidad Project consists of an on-stream dam and a 114,000 acre foot reservoir (TRINIDAD RESERVOIR) on the Purgatoire River approximately four miles upstream from the City of Trinidad. This is a multi-use flood control, reclamation and recreation project authorized by Congress in 1958[1] under the Flood Control Act of 1944.[2] The corps of

---

[1] House Document No. 325 P.L. 85-500, 85th Cong.
[2] P.L. 534, 78th Cong. (1944).

engineers and the Bureau of Reclamation had engaged in planning the project since 1937. The dam was completed and the reservoir ready for the impoundment of water on January 1, 1976.[3]

## IDENTIFICATIONS

The MODEL RESERVOIR, which takes its water from the Purgatoire River (here called the "river"), is located downstream from Trinidad. It was owned by the Model Land and Irrigation Company. There was decreed to the Model Reservoir for annual storage 20,000 acre feet of water with priority date of January 22, 1908. This is called the "MODEL STORAGE RIGHT."

The "DISTRICT" is the Purgatoire River Water Conservancy District. In 1960 it was organized under the Colorado Water Conservancy Act[4] upon petition of the "PROJECT DITCHES," which are ten ditch companies or the ditches owned by them. Among the reasons for its creation and existence were and are: (1) to contract with the United States in connection with the construction and operation of the Trinidad Project; (2) to own the Model Storage Right for the benefit of the users of the Project ditches; and (3) to direct the distribution among the Project ditches of all of their direct flow rights, as well as all storage rights of the District.

The Project ditches divert their water from the Purgatoire River below the Trinidad Dam. They are upstream from the ditches "Highland" mentioned below. These ditches, together with the District, are the plaintiffs-appellants here.

The defendants-appellees Highland Irrigation Company and Nine Mile Canal Co. are referred to collectively as "HIGHLAND." They have direct flow rights for water diverted from the Purgatoire River more than 75 miles downstream from the Trinidad Dam. The intervenor-defendants-appellees Amity Mutual Irrigation Company and the Fort Lyon Canal Company (here called "AMITY" and "FORT LYON" respectively) take water from the Arkansas River at points below its confluence with the Purgatoire River. Their water priorities are junior to those of Highland. Return flows from the irrigation of land under Highland supply water for the water rights of Amity and Fort Lyon. Therefore, anything that benefits Highland in this case also benefits Amity and Fort Lyon.

The following gages are on the river. The MADRID GAGE on the river is just above the Trinidad Reservoir. The R-BAR GAGE is on the

---

[3] The cost was about $44,000,000. For further details as to the project, *see Purgatoire River Water Conservancy District v. Highland Irrigation Company,* 194 Colo. 510, 574 P.2d 83 (1978).

[4] Now section 37-45-101 *et seq.,* C.R.S. 1973.

river 25 or 30 miles below the dam. It is below the headgates of the District ditches. The THATCHER GAGE, also on the river, is about 30 miles downstream from the R-Bar Gage. This record discloses that all return flow to the river from irrigation under the Project ditches returns to the river upstream from the Thatcher Gage.

## PRIORITIES

Of the decreed rights of the Project ditches, 83.44 c.f.s. (cubic feet per second of time) are senior to the rights of Highland. The Model Storage Right is junior to the Highland rights.

## FURTHER FACTS

Historically, in addition to use during the irrigation season, the Project ditches and the Highland have been used for winter irrigation. This has been necessitated by the fact that there has not been a sufficient and steady flow of water during the irrigation season. Winter irrigation is a difficult, less efficient method of irrigation. If possible, a much preferable operation is to store the direct flow winter water and use it later in the year.

It was a part of the plan of the Trinidad Project that the Model Storage Right be transferred to the District and the place of storage be changed to the Trinidad Reservoir, effective at the time of its completion. Then, the *winter* direct flow rights of the Project ditches would be held in storage in the Trinidad Reservoir for use as needed in the spring and summer.[5]

## KEY DOCUMENTS

Some of the principal documents in this case are:

1. House Document No. 325. Footnote 1, *supra.*
2. Contract between the United States and the District dated February 10, 1967 for the construction and payment for the Trinidad Dam and reservoir.[6]
3. Decree of the district court dated March 20, 1967 confirming that contract.
4. "Operating Principles-Trinidad Dam and Reservoir Project," here called the Operating Principles.
5. Decree of the District Court of Las Animas County, Colorado dated April 15, 1965, changing the place of storage of the Model Reservoir Right and providing that storage at the new location would be "conducted in accordance with . . . conditions of operation . . . prescribed by

---

[5] The reservoir is also used to store flood waters for use by the Project ditches. John Martin Reservoir is on the Arkansas River below its confluence with the Purgatoire River. Under the plan, flood water is stored in that reservoir for use by the Project ditches at such time as John Martin Reservoir is not spilling.
[6] Partially predicated upon an ordinance of the City of Trinidad and arrangements made by that City.

House Document 325 . . . as implemented by . . . the 'Operating Principles-Trinidad Dam and Reservoir Project'".

## THE PLAN OF THE PROJECT

The lands irrigated by the Project ditches consist of 19,717 acres. Studies leading to the adoption of House Document No. 325 indicated that, by reason of the erratic flows of the Purgatoire River, only about 63% of optimum plant growth on these Project lands (*i.e.,* the 19,717 acres) had been obtained historically. The Project was intended to increase this optimum beneficial use of water to 84%. To accomplish this, as already mentioned, the plan contemplated change of the Model Storage Right to the Trinidad Reservoir and the storage there of the winter direct flow water of the Project ditches. Winter direct flow irrigation of the Project lands would be terminated. *All* water used under the District's rights to storage and under all of the Project ditches would be administered *by the District* without regard to the respective priorities of the individual Project ditches.

## COURT PROCEEDINGS

On December 3, 1976 the court in the proceedings to change the Model Storage Right entered an order which recited "that the Trinidad Dam has been finally constructed and will be ready for operation on or about January 1, 1977." Accordingly, the District prepared to close the gates of the dam and to commence storage on January 1, 1977. Highland then made a "call" to the Division Engineer of Water Division No. 2, demanding that he enforce their water priority rights which are senior to the Model Storage Right. Acting thereon, and after consultation with the State Engineer, the Division Engineer on December 29, 1976 entered an order forbidding storage in the reservoir. This order stated.

"In the event the downstream calling senior water rights become satisfied or remove their call, the model decree comes in priority, let Trinidad store in accordance with the transferred decree."

On January 3, 1977 the District brought this action against the state water officials and Highland asking that the officials be enjoined from honoring the Highland call. On the same day the water judge denied the District's motion for temporary restraining order. The gates to the reservoir remained open.

Throughout the month of January, 1977 the flow of the river at the Trinidad Reservoir was approximately 10 c.f.s. Following the January 3d refusal of the court to enter a restraining order, the owners of the Project ditches commenced a concerted action of diverting any water flowing in the river into their ditches. Irrespective of whether they otherwise would be engaged in winter irrigation, this was to demonstrate that their upstream ditches could "dry up the river." During the third week in January the State Engineer saw that there was no water in the river at the R-Bar Gage and that the ditch owners had succeeded in drying up the river. By

letters of January 16th and 21st, counsel for the District advised the State Engineer and the Division Engineer that, if they would authorize closing the dam, all headgates of the Project ditches would be closed in accordance with the plan of the Project.

After consultation with the State Engineer, the Division Engineer issued another order on January 25, 1977 which in substance provided in Part:

"The Division Engineer has determined that the December 29th order preventing storage in the reservoir has failed to cause water to become available to Highland and he has rescinded the order effective at midnight on January 26th. Any water so stored in Trinidad Reservoir will be considered to be stored out of priority according to Section 37-80-120 for a period of approximately thirty (30) days during which time results will be observed.

"Until February 25, 1977 a determination will be made whether the stopping of the diversions by the Project ditches, accompanied by storage in the reservoir, would produce more water at the R-Bar Gage than where there are direct flow diversions to the Project ditches and no storage is permitted.

"If measured flow indicates that storage at Trinidad Reservoir and stopping of diversion of direct flow rights results in low water at the R-Bar Gaging Station then the inflow to Trinidad Reservoir as measured at the Madrid Gaging Station, the out of priority stage in Trinidad will accrue to the Trinidad Water Conservancy District; however, if it is determined that less water is available at the R-Bar Gaging Station, the out of priority stage will be released for delivery to the R-Bar Gaging Station less transportation losses. The quantity of deliveries at Madrid and R-Bar Gaging Stations will be computed on a daily average, allowing for a reasonable lag time for travel in the channel.

"From time to time results will be analyzed, and if more water is not produced at the R-Bar Gaging Station under these criteria, this order may be changed to reflect the then-existing factual situation."

On January 26th Highland filed a counter-claim and cross-claim to enjoin the closing of the gates by the water officials. On that same day, after a hearing, the judge issued a temporary restraining order. Following a second day of hearing he ordered that the temporary restraining order should remain in effect. Later the case was tried. After trial and upon agreement of counsel the court ordered counsel to submit proposed findings of fact, conclusions of law, judgment and decree. Counsel for the District, counsel for Highland and the Attorney General submitted their respective proposals. Thereafter, the court entered its findings, conclusions and decree, following substantially the proposal submitted by Highland.

## DECREE FOR CHANGE OF USE AS WELL AS CHANGE OF PLACE OF STORAGE

■ Highland has contended that the 1965 transfer decree merely changed the place of storage of the Model Storage Right to Trinidad Reservoir and did not change to storage the winter direct flow use of the Project ditches. This change of use was set forth as a part of the plan in House Document 325 and the Operating Principles, both of which were incorporated by reference in the decree. The clear effect of the transfer decree was to make the change as set forth in those documents. So far as the persons who are bound by that transfer decree are concerned, the effect was to change both the place of storage and the use of winter direct flow.

We recognize, as did the trial court, that the Project ditches assigned their management rights and did not convey to the District the ownership of the water rights themselves. The court, however, misapprehended the effect of the decree when it stated: "Except for the Model Storage Right, none of the water rights owned or controlled by the [Project ditches has] storage rights decreed to [it]."

## RETURN FLOW

One of the central issues in this case is the rights of Highland to return flow or its equivalent.

■ As stated later herein, Highland had notice of the transfer proceedings culminating in the 1965 decree, and is bound by that decree. If Highland had appeared in those proceedings the decree undoubtedly would have contained conditions which would protect Highland from injury by reason of operation of the Project plan.[7] The result here, however, is substantially the same as if Highland had made a timely appearance and assertion of rights. House Document No. 325 and the Operating Principles were designed to protect Highland's rights in this respect; and, by incorporating that document and the Operating Principles, the decree did protect them.

In its "July 1964 (revised Sept. 1964) Irrigation Report on the Trinidad Project," the United States Department of the Interior, Bureau of Reclamation, Region 7, Denver, Colorado, stated:

## "DOWNSTREAM EFFECTS

"The operation study recognizes the downstream water rights of the Nine Mile and Highland Systems and shows bypasses to satisfy these rights . . . . Storage (except under the Model decree) was limited to water which would otherwise spill from the John Martin Reservoir. As a result of these operating criteria, average stream flow below the project will be about the same in the future as it has been in the past."

---

[7] *City of Grand Junction v. Kannah Creek Water Users Ass'n,* 192 Colo. 279, 557 P.2d 1169 (1976).

Section D1(a) of Article IV of the Operating Principles provides:

"Bypasses to the river shall be made at any time during the year to satisfy downstream senior rights as ordered by the *Colorado State Engineer* to the extent that such demands are not met by stream gains or otherwise satisfied but are limited to the extent as determined by the *Colorado State Engineer* to actually benefit such rights without unnecessary waste through channel losses."

The transfer decree, following the thought of House Document 325 and the Operating Principles, provides:

"5. That the Petitioners' storage of water in the Trinidad Reservoir under the Model Reservoir Right shall be regulated in such manner that the quantity of water occurring in the Las Animas or Purgatoire River at a gauging station on said River below Von Bremmer Arroya shall remain and be the same, as determined by the State Engineer, during any period of ten consecutive years reckoned in continuing progressive series beginning with January 1, 1954 as it would have been had the Model Reservoir Right not been transferred to the Trinidad Reservoir."

The decree then provides that there shall be adequate measurement and recording of the flow of the water, and that there shall be established and maintained not less than three gaging stations. These three stations are designated, one of which is to be "located immediately below Von Bremmer Arroya." Von Bremmer Arroya enters the Purgatoire River immediately above the Thatcher Gage.

■ Thus, the 1965 decree places upon the State Engineer and Division Engineer the duty to make determinations and act so that in the winter Highland will receive the same amount of water which it would have received without the Trinidad Project and with a continuation of historical use of winter water by the Project ditches.

With this basis now established, the next central issue for determination is: Would the operation of the Project with storage of all winter direct flow rights cause a dimunition in the winter water reaching Highland by reason of a lessening of the return flow from the Project lands?

Whether or not there is storage of the winter direct flow rights of the District ditches, it appears to be undisputed that the historical winter irrigation through the Project ditches dries up the river at the location of the headgates of those ditches.

Highland maintains the proposition that, if the Project ditches continue with historical winter irrigation, the return flow from that irrigation will supply its historical uses in the winter. The Highland point of view was supported by the testimony of a hydrologist, Mr. John M. Dumeyer. He expressed the opinion that the return flow to the river resulting from winter irrigation through the Project ditches would occur within a month or two. He concluded that storage of the winter water would materially injure Highland.

The other or District point of view was expressed in the testimony of Dr. Ted M. Zorich, another hydrologist. He was of the opinion that it takes much longer for the return flow to reach the river. In effect, his opinion was that the return flow of water used upon the Project lands during the irrigation season would be extended enough that operation of the Project plan would not materially lessen the amount of return flow from Project lands reaching Highland in the winter time.

■ the court elected to follow the opinion of Mr. Dumeyer. If the case had been in a posture in which the court properly could rule on the requests for the temporary restraining order, we would be bound by the court's acceptance of the opinion of Mr. Dumeyer. The issuance of the orders, however, was premature.

There have been no empirical studies from which it can be determined to a degree approaching categorical certainty whether the opinion of Mr. Dumeyer or the opinion of Dr. Zorich is correct. The order of January 25th was a result of the desire of the State Engineer and Division Engineer to observe the Project plan in operation for a month or so to see if the soundness of either of the conflicting points of view could be demonstrated. It appears from the testimony that, if they had been permitted to make the test and if it had appeared that Highland was injured thereby, Highland's loss could have been promptly compensated.

The court found that from December 29 through January 25 the river flow at Highland averaged 8.43 c.f.s., and that the flow through the Trinidad gates averaged 9.2 c.f.s. The January 25th order attempted to stop diversion by the Project ditches and to close the gates of the reservoir for a period of approximately 30 days. This order was expressly issued under the authority of section 37-80-120, C.R.S. 1973 and the order specifically stated that this would be out-of-priority storage. This section of the statutes states ". . . the state engineer may permit such upstream storage out of priority, but such storage water shall be promptly released on demand of a downstream senior whenever needed by such senior for actual use."

■ The State Engineer and Division Engineer testified to the effect that they wished to see what result this temporary operation of the Project plan would have upon the water reaching the Highland headgate. This, according to them, might be demonstrated by observing the inflow reaching the Trinidad Reservoir as measured at the Madrid Gage, and by observing the water going to Highland as measured at the R-Bar Gage. They further testified in effect that, if it appeared that this test was lessening the water reaching Highland, they would terminate the test and order the gates of the reservoir opened that Highland might have replacement water for the lessened flow. With a minimum hazard to Highland, they were attempting to ascertain how long it would take the return flow from the Project lands to reach Highland.

This is the type of matter in which the water authorities — and not the court — have the right to make the initial determination. That this is the legislative intent is shown in the following statutory provisions:

"The state engineer shall be responsible for the administration and distribution of the waters of the state, and in each division such administration and distribution shall be accomplished through the offices of the division engineer as specified in this article." Section 37-92-301(1), C.R.S. 1973.

"Each division engineer shall order the total or partial discontinuance of any diversion in his division to the extent the water being diverted is not necessary for application to a beneficial use; and he shall also order the total or partial discontinuance of any diversion in his division to the extent the water being diverted is required by persons entitled to use water under water rights having senior priorities, but no such discontinuance shall be ordered unless the diversion is causing or will cause material injury to such water rights having senior priorities. In making his decision as to the discontinuance of a diversion to satisfy senior priorities the division engineer shall be governed by the following: The materiality of injury depends on all factors which will determine in each case the amount of water such discontinuance will make available to such senior priorities at the time and place of their need. Such factors include the current and prospective volumes of water in and tributary to the stream from which the diversion is being made; distance and type of stream bed between the diversion points; the various velocities of this water, both surface and underground; the probable duration of the available flow; and the predictable return flow to the affected stream. *Each diversion shall be evaluated and administered on the basis of the circumstances relating to it* and in accordance with provisions of this article and the court decrees adjudicating and confirming water rights. In the event a discontinuance has been ordered pursuant to the foregoing, and nevertheless such does not cause water to become available to such senior priorities at the time and place of their need, then such discontinuance order shall be rescinded. If a well has been approved as an alternate means of diversion for a water right for which a surface means of diversion is decreed, such well and such surface means must be utilized to the extent feasible and permissible under this article to satisfy said water right before diversions under junior water rights are ordered discontinued." (Emphasis added.) Section 37-92-502(2), C.R.S. 1973.

The statute gives a division engineer the right to make an evaluation. Here, he attempted to do this, but the court prevented it. After the division engineer has conducted a reasonable empirical study, the court has its role to play in judging whether his orders of release or impoundment have been correct. Therefore, the temporary restraining order of

January 26th, together with the injunction making the same permanent, are reversed.[8]

## ABANDONMENT

■ The court's judgment was entered on June 23, 1977.[9] It ruled that Highland Irrigation Company, not having been a party at the time of the entry of the transfer decree relating to the Model Storage Right on April 15, 1965, it could raise the issue of abandonment. It further ruled that of the 20,000 foot decree of the Model Storage Right, 13,800 acre feet had been abandoned and the storage right was reduced to 6200 acre feet.

Thereafter, on January 30, 1978 we announced our opinion in *Purgatoire River Water Conservancy District v. Highland Irrigation Company,* 194 Colo. 510, 574 P.2d 83. In 1976, prior to the supplementary decree of December 3, 1976, Highland Irrigation Company attempted to intervene in the transfer proceedings, alleging that for many years the storage capacity of the Model Reservoir had been 6,000 acre feet or less. It prayed that the April 15, 1965 decree be modified to allow the storage of a maximum of 6,000 acre feet. On November 12, 1976 the district court, finding that Highland Irrigation Company had been validly notified at the commencement of the transfer proceedings, dismissed its attempted intervention. This ruling was appealed to us. In our January 30, 1978 opinion we affirmed and held that Highland Irrigation Company was bound by the 1965 decree. Thus, we then in effect overruled the portion of the judgment in the instant case relating to abandonment. Our opinion is dispositive on the same issue so far as Nine Mile Canal Co., Amity and Fort Lyon are concerned.[10]

Highland, Amity and Fort Lyon argue that under *City of Westminster v. Church,* 167 Colo. 1, 445 P.2d 52 (1968), the district court here had jurisdiction to decree abandonment. We find the argument without merit. As distinct from the situation in *Westminster,* here Highland Irrigation Company was before the court in both cases, the issue was decided in the proceedings culminating with our January 30, 1978 opinion, and the matter is *res judicata.* The district court is reversed as to the

---

[8] Our ruling creates difficulties. Tests by the water authorities cannot be made at any time. Unless they have discovered other methods of research, to approach the matter in the same manner as in January 1977 means that it again must be approached during the winter season.

From hindsight it must be apparent to the State Engineer that his methods of research can be improved. For example, it was more convenient for the water commissioner to read the R-Bar Gage than the Thatcher Gage and apparently the water authorities thought that the reading of the R-Bar Gage would suffice in making the test. Not only does the 1965 decree specify readings at the Thatcher Gage, but the testimony appears to be without dispute that some return flow from the irrigation of District lands enters the river between the R-Bar Gage and the Thatcher Gage.

[9] There was some modification of the decree on August 18, 1977.

[10] Nine Mile Canal Co. never appeared in the transfer case. Amity and Fort Lyon consented to the decree therein.

abandonment issue.

## REMAND

There is no question that the court has jurisdiction to review the acts of the State Engineer and Division Engineer, after they have had an opportunity in a reasonable manner to make determinations, and that the court has jurisdiction to correct errors in administration of decrees. We, therefore, gave thought as to whether we should now direct the court to retain jurisdiction in this matter in order that it might review the actions of the State Engineer and those acting under him after tests and evaluations. We have concluded that, if there is to be further litigation in this case, it will be better if it begins anew.

We, therefore, reverse and remand the cause with directions that the water court dismiss it without prejudice.

MR. JUSTICE ERICKSON and MR. JUSTICE CARRIGAN concur in part and dissent in part.

MR. JUSTICE ROVIRA does not participate.

MR. JUSTICE ERICKSON dissenting in part and concurring as to the abandonment result reached by the majority:

I respectfully dissent. I would affirm the trial court as to the questions discussed below. A brief review of the facts put the issues before us in perspective:

The Trinidad Reservoir is located a few miles above the City of Trinidad. The ditches which make up the Purgatoire River Water Conservancy District (District) are below the City of Trinidad. The headgates of Highland and Nine-Mile are some 75 miles below the ditches administered by the District.

The District, and those representing a number of ditches within the District, have appealed from the water court's judgment and decree prohibiting state water officials from allowing water to be stored in the newly completed Trinidad Reservoir because of a call for water which was made by two downstream non-member ditches, the Highland and the Nine-Mile Ditch. The trial court's judgment was entered after extended hearings and with full recognition of the fact that the cost of construction of the Trinidad Reservoir exceeded 44.5 million dollars.

The Trinidad Reservoir was constructed to prevent destructive flooding by the Purgatoire River. It was constructed after a study by the corps of engineers which was commenced in 1938. The report suggested that a multi-purpose reservoir which would serve for flood control, irrigation, and recreation uses be established upstream from the City of Trinidad.

Eventually, the report was adopted by Congress in 1954 and published as House Document 325. By the Flood Control Act of 1958,

Congress authorized construction of the Trinidad Dam in accordance with the principles embodied in House Document 325.

The District was formed in 1960 to encompass the ditches within the project area. Those ditches had historically diverted water for winter irrigation, and the return flows from that irrigation had been used and reused by downstream appropriators. The District was designed to administer the direct flow rights of the ditches which comprise it, as well as the 1908 decreed storage right of 20,000 acre feet of water in the Model Reservoir.

The report recommended that the Trinidad Reservoir be operated in accordance with several conditions, two of which are relevant here: (1) the Model Reservoir Storage right would be transferred to the proposed Trinidad Reservoir, and (2) the stream flows historically diverted by the project ditches for winter irrigation would be stored in the proposed Trinidad Reservoir. Water which was stored during the winter irrigation season would be released during spring and summer irrigation seasons to members of the District.

After three years of negotiation, operating principles for the Trinidad project were developed. It was intended that the principles would effectuate the conditions set forth above, ensure that the project complied with federal and state law, and achieve maximum irrigation benefits. It was recognized that storage of water which had previously been diverted by the project ditches for winter irrigation could harm the downstream appropriators who had historically relied on the return flow from those diversions to fulfill their decreed rights. Protection was afforded to downstream senior water rights by Article IV D1 of the Operating Principles.

"1. *Non-interference With Downstream Water Rights.*

"(a) Bypasses to the river shall be made at any time during the year to satisfy downstream senior rights as ordered by the *Colorado State Engineer* to the extent that such demands are not met by stream gains or otherwise satisfied but are limited to the extent as determined by the *Colorado State Engineer* to actually benefit such rights without unnecessary waste through channel losses." (Emphasis in original.)

It is not disputed that Highland and Nine-Mile are among the intended beneficiaries of the requirement that the District comply with an order issued by the state engineer. The order was to bypass water to the river for the benefit of senior downstream users whenever the downstream demands are not met by stream gains or otherwise satisfied so long as unnecessary waste would not result through channel losses.

In 1965, the District Court for Las Animas County entered a decree transferring the 20,000 acre feet of storage of the Model Reservoir to the proposed Trinidad Reservoir. The decree required that storage in the reservoir be maintained in such a manner that the quantity of water in the river downstream not vary from the amount of flow measured over the ten-year period immediately prior to the operation of the reservoir.

By a 1967 decree, the Las Animas County District Court approved both the reimbursement contract between the Bureau of Reclamation and the District, which provided for repayment of the project costs allocable to irrigation and the contracts between the District and the member ditches whereby the District was to administer and store the ditches' direct flow rights.

The contracts approved by the Las Animas County District Court incorporated the project operating principles, and as the majority recognizes, those principles are binding on the parties to this proceeding. The Las Animas County District Court retained jurisdiction over the matter in order to be able to declare its decree operative when the reservoir was completed.

Once the conditions precedent to formation of the project area were completed, construction of the Trinidad Reservoir began. The project was completed in 1976. The gates of the Trinidad Reservoir were closed temporarily for testing. They have not been closed since.

On December 3, 1976, the Las Animas County District Court entered an order which decreed that the storage rights granted under its 1965 decree would become effective on January 1, 1977. The District planned to close the gates and to begin storing water on that date.

The trial court found, and the majority agrees, that the decreed water rights of Highland and Nine-Mile are junior to the diversion rights of the project ditches, but senior to the Model Reservoir Storage rights which were transferred to the Trinidad Reservoir by the 1965 decree of the Las Animas County District Court. Thus, the proposed January 1, 1977, storage would have been out of priority with respect to the rights of Highland and Nine-Mile, and such storage could not begin until the requirements of section 37-92-502(2), C.R.S. 1973, were complied with.[1]

On December 18, 1976, Highland and Nine-Mile, in anticipation of the proposed commencement of storage, put a call on the river, demanding fulfillment of their senior priority rights.

---

[1] Section 37-92-502(2), C.R.S. 1973, provides, in pertinent part:

"(2) Each division engineer shall order the total or partial discontinuance of any diversion in his division to the extent the water being diverted . . . is required by persons entitled to use water under water rights having senior priorities, but no such discontinuance shall be ordered unless the diversion is causing or will cause material injury to such water rights having senior priorities. In making his decision as to the discontinuance of a diversion to satisfy senior priorities the division engineer shall be governed by the following: The materiality of injury depends on all factors which will determine in each case the amount of water such discontinuance will make available to such senior priorities at the time and place of their need. Such factors include the current and prospective volumes of water in a tributary to the stream from which the diversion is being made; distance and type of stream bed between the diversion points; the various velocities of this water, both surface and underground; the probable duration of the available flow; and the predictable return flow to the affected stream. . . . In the event a discontinuance has been ordered pursuant to the foregoing, and nevertheless such does not cause water to become available to such senior priorities at the time and place of their need, then such discontinuance order shall be rescinded . . . ."

On December 29, 1976, the division engineer ordered that no storage would be allowed in the Trinidad Reservoir until the calls of Highland and Nine-Mile were filled. The division engineer provided in his order that, if their rights were satisfied, the District could begin storing its junior Model Reservoir Storage rights in the Trinidad Reservoir. The trial court found that the division engineer's "order of December 29 [1976] had in fact caused water to become available to calling seniors at the time and place of their need." It also found that the Purgatoire River was a "live stream" from the Trinidad area to Highland's headgates, and that "during the period in question, water passing Trinidad Reservoir in the Purgatoire River provided a major portion of the water diverted by Highland, either as direct river flow or as a part of a continuous irrigation and return flow cycle." Thus, the trial court found that the December 18, 1976, call placed by Highland and Nine-Mile was not futile.

However, on January 25, 1977, the division engineer issued a second order, which permitted the District to commence storage on January 26, 1977. The order provided that the storage would be out of priority, pursuant to section 37-80-120, C.R.S. 1973. The order was premised on the division engineer's declaration that his order of December 29, 1976, had failed to make water available to Highland, and the division engineer "discontinued" his order of December 29. *See* section 37-92-502(2), C.R.S. 1973.

The determination that the calls placed by Highland and Nine-Mile were futile was premised upon the condition that if the storage of the winter irrigation flows in the Trinidad Reservoir should cause less water to be available to Highland and Nine-Mile, water would be released from storage for their benefit.

Following the division engineer's order of December 29, 1976, that storage in the Trinidad Reservoir be delayed until the calls of Highland and Nine-Mile were satisfied, the division engineer entered into negotiations with the District. As a result of these negotiations, the trial court found that:

"It appears from the testimony of defendant Kuiper that the State Engineer acting through the Division Engineer made an agreement under which the District and its member ditches would forgo direct flow diversions for winter irrigation in exchange for the obligation of the State Defendants to store the waters thus released in Trinidad Reservoir. The Court finds that the State Defendants by [the Division Engineer's] order of January 25 acted upon the promise made by the District to release the direct flow rights under its control to the river . . . ."

Thus, the division engineer's futile call determination of January 25, was based, not on the requisites of section 37-92-502(2), C.R.S. 1973, but on a condition that the futile call determination was subject to an agreement that, while storage in the Trinidad Reservoir could begin, it

was subject to a possible subsequent decision of the division engineer that storage was causing harm to Highland and Nine-Mile.

As noted above, the trial court found the December 18, 1976, call of Highland and Nine-Mile was *not* futile, and that the division engineer's order of December 29, had caused water to become available to Highland and Nine-Mile at the time and place of their need. The trial court made several findings regarding the division engineer's futile call determination of January 25, 1977.

"Under C.R.S. 1973, 37-92-502(2) the Division Engineer is authorized to issue orders for the discontinuance of any diversion to the extent the water is required by persons having senior priority, but no such discontinuance shall be ordered unless the diversion is causing or will cause 'material injury' to the senior rights. The determination of the materiality of the injury is made to depend upon the facts of each case and is governed by those factors specified in 502(2). The December 29 order has been characterized by some counsel as a discontinuance order, but the Court finds from the testimony of the Division Engineer that it discontinued nothing, since the gates on the reservoir had never been closed to store water. As the Division Engineer testified, the December 29 order was entered to ensure that the gates were not closed, not to discontinue a present diversion. On the theory, however, that the December 29 order is a discontinuance order, the plaintiffs and the State Defendants urge that the December 29 order failed to 'cause water to become available to such senior priorities at the time and place of their need,' and was therefore properly rescinded by the January 25 order. On this point, the Court concludes as follows: If the December 29 order is in fact a discontinuance order, the record reflects, and the Court so finds, that neither the written order of December 29 nor the testimony of the Division Engineer demonstrate that he considered the five factors which the statute requires him to consider before discontinuing 'a diversion to satisfy senior priorities.' The statute does not apply to the facts before the Court. Moreover, the statute provides no basis for a later order (January 25) which if not enjoined by order of this Court, would have impounded an average daily flow of 9 or 10 c.f.s. during the thirty (30) days it was to remain in effect. Impounding the headwaters of a river seems to be an inefficient way to increase the flow below the impoundment."

This conclusion is fully supported by the record. Thus, the order of January 25, 1977, was premised, not on the requirements of section 37-92-502(2), but on the division engineer's decision to determine at some later date whether or not Highland and Nine-Mile would be harmed by storage. The trial court recognized that the division engineer had full authority to determine that the December 18, 1976, call of Highland and Nine-Mile had been futile, but it also recognized that such a determination could only be made after the division engineer had complied with the terms of

section 37-92-502(2), C.R.S. 1973. Accordingly, the trial court's decree provided, in part, that:

"The State Engineer, Division Engineer and Water Commissioner be and hereby are enjoined and restrained from storing water out of priority under the Model Storage Right when Highland and Nine Mile are calling for water under rights senior to the Model Storage Right, *unless the Division Engineer should first determine in accordance with Colorado law that the Highland and Nine Mile calls are futile.*" (Emphasis supplied.)

From the above, it is clear that the trial court did not usurp the division engineer's authority to test the hypothesis that storage of waters previously diverted for winter irrigation would not harm Highland and Nine-Mile. Rather, the trial court held that, before the division engineer could order storage, he must make his futile call determination in accordance with the statutory directives, and that the division engineer was acting in excess of his authority by failing to do so. In this respect, the trial court was correct.

The trial court also found that the division engineer failed to comply with the operating principles for the Trinidad Reservoir when he issued his January 25, 1977, order to begin storage in the Trinidad Reservoir. The operating principles were incorporated into the 1967 Las Animas County District Court decree, and when the division engineer permitted out-of-priority storage of the waters governed by that decree, he was required to abide by its terms.

The trial court found that the division engineer had failed to comply with at least two provisions of the Las Animas County District Court's decrees when he issued his order of January 25, 1977:

"The Court finds that the District, in connection with its proposals for winter storage, made no attempt to estimate evaporation losses from water in storage as required by Article IV, paragraph D.4 of the Operating Principles incorporated by reference in the April 14, 1965 transfer decree.

. . . .

"The State has not calculated the 10-year running average of river flows as required by the Operating Principles and therefore has no standard against which to measure the results of its order of January 25, 1977, had that order been allowed to become effective."

These findings served as the basis for two of the trial court's conclusions of law:

"The Division Engineer, acting for the State Engineer by statute, would have, but for the entry of a temporary restraining order by this Court on January 31, 1977, failed to make the bypass to the river to satisfy the rights of Highland and Nine Mile which are senior to the Model Storage Right. His order of January 25 would have shut the gates on the Trinidad Reservoir, thus precluding the bypass required by D.1.(a), of Article IV of

the Operating Principles, which are incorporated into the 1965 degree. According to the testimony of the Division Engineer, the downstream rights of Highland and Nine Mile senior to the Model Storage Right had not been 'met by stream gains or otherwise satisfied,' and neither the State Engineer nor the Division Engineer had determined whether a bypass would 'actually benefit such rights without unnecessary waste through channel losses.' To that extent, at least, the Court concludes as a matter of law that the Division Engineer has failed to comply with the Operating Principles incorporated into the 1965 decree for the protection of the Nine Mile and Highland rights.

"The Division Engineer acted in excess of his constitutional and statutory jurisdiction and authority when he ordered the out of priority storage in the Trinidad Reservoir under the terms of the 1965 decree which by its own terms provided that bypasses to the river shall be made at any time during the year to satisfy downstream senior rights to the extent that such demands are not met by stream gains or otherwise satisfied but are limited to the extent as determined by the State Engineer to actually benefit such rights without unnecessary waste through channel losses."

In order to ensure that the division engineer complied with the Operating Principles, the trial court decreed that:

"The State Engineer, Division Engineer and Water Commissioner be and hereby are ordered to bypass water to the Purgatoire River below the Trinidad Reservoir as required by D.1(a) of Article IV of the Operating Principles to satisfy the water rights of Highland and Nine Mile which are senior to the Model Storage Right to the extent that demands of Highland and Nine Mile are not met by stream gains or otherwise satisfied, but such bypasses are limited to the extent as determined by the Division Engineer to actually benefit such Highland and Nine Mile rights without unnecessary waste through channel losses in accordance with applicable Colorado law regarding futile calls."

Thus, the trial court endeavored to ensure that the division engineer acted within the scope of his authority. The "conditional futile call" order of January 25, 1977, which resulted from the agreement which the division engineer made with the District, is not the type of action which is contemplated by section 37-92-502(2), C.R.S. 1973. That statute, and the operating principles which were incorporated into the junior Model Reservoir Storage right which was benefitted by the division engineer's futile call order, provide detailed criteria which spell out the conditions under which out-of-priority storage is permitted. The division engineer failed to comply with these requirements. As such, the actions of the trial court were not, as the majority has determined, a usurpation of the powers possessed by the state engineer. The trial court, as reflected by the quoted portions of its decree, sought to require the state engineer to exercise his authority within the proper limits.

In all other respects, I concur in the result reached by the majority, but the decision of the trial court as to the issues discussed above should be affirmed.

MR. JUSTICE CARRIGAN has authorized me to say that he joins me in this dissent.