39 P.3d 1139 (2001)
EMPIRE LODGE HOMEOWNERS' ASSOCIATION, a Colorado non-profit corporation, Plaintiff-Appellant,
v.
Anne MOYER and Russell Moyer, individually and as Co Personal Representatives of the Estate of Maxine Reddy, deceased, and as Co-Trustees of the Maxine Reddy Trust, Defendant-Appellee, and
Steven J. Witte, Division Engineer, Water Division 2, Appellee pursuant to C.A.R. 1(e).
No. 00SA211.
Supreme Court of Colorado, En Banc.
December 17, 2001.
As Modified on Denial of Rehearing February 11, 2002.
*1142 Felt, Monson & Culichia, L.L.C., James G. Felt, Steven T. Monson, James W. Culichia, *1143 Bradford R. Benning, Colorado Springs, CO, Attorneys for Plaintiff-Appellant.
The Law Office of Thomas R. Raynes, LLC, Thomas R. Raynes, Gunnison, CO, Attorney for Defendants-Appellees.
Ken Salazar, Attorney General, Steven O. Sims, First Assistant Attorney General, Shana Smilovits, Assistant Attorney General, Denver, CO, Attorneys for State and Division Engineers.
Moses, Wittemyer, Harrison & Woodruff, P.C., Veronica A. Sperling, Richard J. Mehren, Boulder, CO, Attorneys for Amicus Curiae City of Boulder.
Timothy R. Buchanan, P.C., Timothy R. Buchanan, Peter D. Mohr, Arvada, CO, Attorneys for Amicus Curiae Fort Morgan Reservoir and Irrigation Company and the Jackson Lake Reservoir and Irrigation Company.
Hill & Robbins, P.C., David W. Robbins, Dennis M. Montgomery, Denver, CO, Attorneys for Amicus Curiae Groundwater Appropriators of the South Platte, Inc.
Justice HOBBS delivered the Opinion of the Court.
This appeal is from a judgment of the District Court for Water Division No. 2 (Water Court) in favor of the operators of a decreed irrigation water right, Anne and Russell Moyer (Moyers), against an out-of-priority diverter, Empire Lodge Homeowners' Association (Empire Lodge), which has been filling two ponds for fishing and recreation at a subdivision.[1] The Moyers placed frequent calls to curtail Empire Lodge's pond-filling diversions. Citing the State Engineer's approval of its out-of-priority diversions, Empire Lodge filed suit in water court, alleging enlargement of the Moyers' use and invoking the futile call doctrine. The Moyers counterclaimed to enjoin Empire Lodge's out-of-priority diversions to its ponds, alleging that Empire Lodge's failure to obtain an augmentation plan decree authorizing the out-of-priority diversions rendered the diversions illegal.
The Water Court dismissed Empire Lodge's complaint against the Moyers and issued an injunction in favor of the Moyers, ordering cessation of Empire Lodge's out-of-priority diversions absent adjudication authorizing them. Empire Lodge appealed. We affirm the Water Court's judgment. We hold that: (1) Empire Lodge lacked standing in water court to invoke the futile call or enlargement doctrines against the Moyers' *1144 water use; (2) Empire Lodge's out-of-priority diversions required an augmentation plan decree authorizing them; and (3) the Water Court did not abuse its discretion in enjoining Empire Lodge's out-of-priority diversions pending adjudication authorizing them. We therefore affirm the Water Court's judgment.

I.
Empire Lodge is a Colorado nonprofit homeowners' association formed in connection with the Beaver Lakes Estates Subdivision, the development of which commenced in the early 1970s in Lake County, Colorado. Comprised of 261 lots, the subdivision is located approximately seven miles south of Leadville along Empire Creek, a tributary to the Arkansas River. The Moyers, co-trustees of the Maxine Reddy Trust, operate a large ranch located along Empire Creek downstream from Empire Lodge.
Empire Lodge has been diverting water out of priority to fill two ponds known as the Beaver Lakes, which the residents of the Beaver Lakes Subdivision utilize for fishing and recreation. It does not have an augmentation plan decree, or a conditional or absolute decree confirming a water appropriation and adjudicating a priority for filling the ponds.
Empire Lodge's out-of-priority diversions travel via the Nelson Woods No. 2 Ditch to the upper Beaver Lake, filling it, then travel to the lower Beaver Lake, filling it, with the water then spilling back to Empire Creek. The upper and lower ponds have surface areas of 3.87 acres and 10.59 acres, respectively. While the ponds are filling, no water returns to Empire Creek.
Empire Lodge is also the owner of a water right diverted by means of the Nelson Woods No. 2 Ditch right, adjudicated July 9, 1907 for 1.25 c.f.s. for irrigation and domestic use with a priority date of April 29, 1891.[2] This water right is rarely in priority due to the call of senior water rights diverting from the Arkansas River and its tributaries. Empire Lodge relies on the State Engineer's approval for its out-of-priority diversions to fill the two ponds because its Nelson Woods No. 2 right is too junior to fill the ponds reliably due to the overappropriation of the Arkansas River Basin.[3] Empire Lodge has not obtained a change decree to use the Nelson Woods No. 2 right to fill the two ponds or as augmentation credit for out-of-priority diversions into the ponds.
In 1986, the State Engineer informed Empire Lodge that it needed an augmentation plan decree from the water court. From 1987 to 1997, Empire Lodge made its out-of-priority diversions under periodic approvals by the State Engineer that were conditioned on Empire Lodge filing an augmentation plan application with the water court.[4] These approvals contained conditions requiring substitute water to the Arkansas River and subjecting Empire Lodge's water use to the call of the Moyers' Empire Creek Ditch right.[5] As a substitute supply, Empire Lodge leased shares of Twin Lakes Reservoir and Canal Company water. The point of *1145 replacement into the Arkansas River was below the Moyers' point of diversion on Empire Creek. The Moyers irrigate their property with 4.9 c.f.s. from Empire Creek, decreed under Priority No. 34 to the Empire Creek Ditch.[6] Empire Lodge did not provide a substitute supply to the Moyers' water right. Over the course of twelve years, Empire Lodge failed to initiate a water court augmentation plan proceeding.
The Moyers placed frequent calls upon Empire Lodge's pond-filling activities. In response to these calls, Empire Lodge sought a futile call determination[7] from the Division Engineer. Relying on a study Empire Lodge commissioned, the Division Engineer identified conditions upon which a futile call determination might be made, but no futile call determination actually resulted therefrom.
In January 1994, the Moyers sued Empire Lodge in Lake County District Court (Lake County lawsuit) alleging that: (1) Empire Lodge had violated an easement agreement between the Moyers and Empire Lodge; and (2) Empire Lodge had illegally diverted water, causing injury to the Moyers' water rights. In the Lake County lawsuit, the court retained jurisdiction over the easement issue but dismissed the diversion issue as being a "water matter" consigned exclusively to the water court.[8]
On August 23, 1996, without possessing any decree for its pond filling activities, Empire Lodge filed suit in water court for relief against the Moyers claiming that they had: (1) unlawfully expanded their irrigated acreage to include land outside of their decreed place of use without applying for a change of use; (2) were using water for undecreed purposes; (3) were irrigating land required to be removed from irrigation through a "dry-up" covenant in the Parkville Water District water transfer; and (4) were violating the "duty of water" limitation, one cubic foot per second of water per fifty acres, expressed in the decree. Seeking an injunction against the Moyers' water use, Empire Lodge contended that the Moyers' enlargement of its decreed rights had caused their complained-of water shortage, not operation of Empire Lodge's diversions. Empire Lodge also sought an order prohibiting the Moyers from exercising a call through their Empire Ditch decree.
On September 16, 1996, the Water Court issued an order approving stipulations of the parties requiring the Moyers to release the call on Empire Creek for 0.75 c.f.s. for as long as necessary to allow the Beaver Lakes to spill back into Empire Creek and prohibiting the Moyers from irrigating north of the Beaver Lakes Estates' access road for the *1146 remainder of 1996, but allowing the Moyers to run water to a reservoir on their land.
On September 18, 1996, with court approval, the Moyers amended their answer and asserted counterclaims, alleging injury to their water right and seeking entry of a declaratory judgment against Empire Lodge:
declaring that Plaintiff Empire [was] illegally appropriating water, illegally storing water and unilaterally implementing a change in use of its water rights without approval of a Court or the State and Division Engineer and that by virtue of such declaration, Plaintiff Empire is not entitled to divert any water for these inappropriate and illegal purposes.
The Moyers also sought an injunction prohibiting Empire Lodge's diversions to the Beaver Lakes in the absence of an adjudicated augmentation plan.
The Water Court issued its Order and Judgment on March 13, 2000. The Water Court dismissed Empire Lodge's claims and issued an injunction against operation of Empire Lodge's out-of-priority diversions pending adjudication of an augmentation plan. With respect to the State Engineer's authority to approve Empire Lodge's out-of-priority diversions, the Water Court observed that the State Engineer has some "not clearly defined" authority, although "such authority may not substitute for or inappropriately intrude upon the authority of the water courts to adjudicate water rights." The Water Court said, "Without an application being filed, with resume notice and possible participation by objectors, the Court is not able to appropriately determine, despite the assurances of the State Engineer, that there has not been or will not be in the future, some injury to the Arkansas River."
Empire Lodge contends in this appeal that section 37-80-120, when combined with the State Engineer's approval of its out-of-priority diversions, conferred upon it a legally protected water right entitling it to invoke the futile call and enlargement doctrines against the Moyers' water use. The Moyers respond that the Water Court correctly enjoined Empire Lodge's out-of-priority diversions until such time as Empire Lodge obtains an augmentation plan decree. We affirm the Water Court's judgment.

II.
We hold that: (1) Empire Lodge lacked standing in court to invoke the futile call or enlargement doctrines against the Moyers' water use; (2) Empire Lodge's out-of-priority diversions required an augmentation plan decree authorizing them; and (3) the Water Court did not abuse its discretion in enjoining Empire Lodge's out-of-priority diversions pending adjudication authorizing them.
In the absence of an augmentation plan adjudication for its out-of-priority diversions, Empire Lodge asserts standing to bring its claims against the Moyers' water use based on State Engineer approval. To assess whether Empire Lodge has standing, we examine Colorado's system of prior appropriation, adjudication, and administration of use rights to waters of the natural stream. We address the authority and roles of the water court and the State Engineer in regard to exchanges and augmentation plans employing a substitute supply of water. Based on analysis of the constitutional, statutory, and case precedent authority, we conclude that Empire Lodge lacked standing to assert its claims against the Moyers' water use and that the Moyers had standing to seek an injunction against the out-of-priority diversions in the absence of a court-decreed augmentation plan. Finally, we determine that the Water Court's judgment was not erroneous.

A.

Water Court and State Engineer Authorities

1. Adjudication and Administration of Natural Stream Use Rights
Prior appropriation water law is a property rights-based allocation and administration system that promotes multiple use of a finite resource for beneficial purposes.[9] *1147 Accordingly, it fosters optimum use, efficient water management, and priority administration. See Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson, 990 P.2d 46, 54 (Colo.1999). The objective of the water law system is to guarantee security, assure reliability, and cultivate flexibility in the public and private use of this scarce and valuable resource. Security resides in the system's ability to identify and obtain protection for the right of water use. Reliability springs from the system's assurance that the right of water use will continue to be recognized and enforced over time. Flexibility emanates from the fact that the right of water use can be changed, subject to quantification of the appropriation's historic beneficial consumptive use and prevention of injury to other water rights.
Colorado's prior appropriation system centers on three fundamental principles: (1) that waters of the natural stream, including surface water and groundwater tributary thereto, are a public resource subject to the establishment of public agency or private use rights in unappropriated water for beneficial purposes; (2) that water courts adjudicate the water rights and their priorities; and (3) that the State Engineer, Division Engineers, and Water Commissioners administer the waters of the natural stream in accordance with the judicial decrees and statutory provisions governing administration. Santa Fe Trail Ranches, 990 P.2d at 53-54, 58.
The right guaranteed under the Colorado Constitution is to the appropriation of unappropriated waters of the natural stream, not to the appropriation of appropriated waters. See Colo. Const. art. XVI, § 5 ("The water of every natural stream, not heretofore appropriated within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided."); Colo. Const. art. XVI, § 6 ("The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied."); Strickler v. City of Colo. Springs, 16 Colo. 61, 73, 26 P. 313, 317 (1891) (holding that the use of the words "not heretofore appropriated" in section five and "unappropriated waters" in section six clearly indicates an intention to limit the application of these constitutional provisions); § 37-90-137(2)(b)(I) (providing that the State Engineer shall not issue a well permit to withdraw tributary groundwater unless unappropriated water is available and the vested water rights of others will not be materially injured).
The property right we recognize as a Colorado water right is a right to use beneficially a specified amount of water, from the available supply of surface water or tributary groundwater, that can be captured, possessed, and controlled in priority under a decree, to the exclusion of all others not then in priority under a decreed water right. Santa Fe Trail Ranches, 990 P.2d at 53. "Water right" means a right to use in accordance with its priority a certain portion of the waters of the state by reason of the appropriation of the same. § 37-92-103(12), 10 C.R.S. (2001). A water right is created when a person appropriates or initiates an appropriation of unappropriated water of a natural stream of the state. Shirola v. Turkey Canon Ranch Ltd. Liab. Co., 937 P.2d 739, 748 (Colo.1997).
A right to use water of the natural stream arises from placing the unappropriated water to beneficial use; a conditional water right holds a place in the priority system to which the water right antedates in the event the appropriator places the unappropriated water to beneficial use. Dallas Creek Water Co. v. Huey, 933 P.2d 27, 35 (Colo. 1997). Conditional water rights are subject to a requirement of reasonable diligence in actualizing the intended appropriation, and the applicant must file a diligence application six years after the entry of the prior conditional decree or diligence decree for an examination of reasonable diligence in completing *1148 the appropriation. § 37-92-304(4)(a)(I) & (III), 10 C.R.S. (2001); Mun. Subdist. v. Chevron Shale Oil Co., 986 P.2d 918, 921 (Colo.1999). A decree for an absolute water right confirms that an appropriative right has vested and identifies the right's priority and amount. Williams v. Midway Ranches Prop. Owners Ass'n, 938 P.2d 515, 521 (Colo. 1997).[10]
Appropriation of natural stream waters is subject to administration in priority in accordance with judicial decrees determining the existence of water rights.[11]Aspen Wilderness Workshop, Inc. v. Hines Highlands Ltd. P'ship, 929 P.2d 718, 724 (Colo. 1996). A water right adjudication is a proceeding to determine the respective priorities of water rights on the stream system for purposes of administration. City of Lafayette v. New Anderson Ditch Co., 962 P.2d 955, 960 (Colo.1998). Direct flow water rights and storage water rights are entitled to administration based on their priority, regardless of the type of beneficial use for which the appropriation was made. People ex rel. Park Reservoir Co. v. Hinderlider, 98 Colo. 505, 515, 57 P.2d 894, 898-99 (1936) (Butler, J., concurring). The applicant for issuance of a conditional decree bears the burden of demonstrating that there is unappropriated water available for the appropriation, taking into account the historic exercise of decreed water rights. Bd. of County Comm'rs v. Crystal Creek Homeowners' Ass'n, 14 P.3d 325, 333 (Colo.2000). In order to perfect the conditional right and obtain an absolute decree, the applicant must have: (1) captured, possessed, and controlled unappropriated water; and (2) placed the water to beneficial use. City of Lafayette, 962 P.2d at 961.
Water rights are decreed to structures and points of diversion. Dallas Creek Water Co., 933 P.2d at 38. But see Colo. River Water Conservation Dist. v. Colo. Water Conservation Bd., 197 Colo. 469, 475, 594 P.2d 570, 574 (1979) (establishing that, instead of identifying diversion points and structures, instream flow or lake level water rights identify stream segments or lakes for preservation of the environment to a reasonable degree). Priority, location of diversion at the source of supply, and amount of water for application to beneficial uses are the essential elements of the appropriative water right. People ex rel. Simpson v. Highland Irrigation Co., 917 P.2d 1242, 1252 n. 17 (Colo.1996).
The priority of a water right is a function of appropriation and adjudication, and is the most important stick in the water rights bundle. Navajo Dev. Co. v. Sanderson, 655 P.2d 1374, 1377-78 (Colo.1982). As set forth by statute, the filing date of the application for a decree sets the year of the adjudicated priority; as between water rights filed in the same year, the date of appropriation controls priority administration. § 37-92-306, 10 C.R.S. (2001). The purpose of adjudication is to assign priorities of use; a decree confirms the existence of the water right but does not create the right. Shirola, 937 P.2d at 748.
Adjudication and administration are essential to protection of water rights. The reason for adjudicating a water right, whether an appropriative water right under state water law or a water right created under federal law,[12] is to realize the value and expectations that enforcement through administration *1149 of that right's priority secures.[13]See § 37-82-101, 10 C.R.S. (2001); § 37-92-301(3), 10 C.R.S. (2001).
Colorado early recognized the interlocking nature of appropriation, adjudication, and administration. The 1879 and 1881 Acts provided for courts to adjudicate irrigation water rights and the water officials to administer them in priority. See Act of Feb. 19, 1879, secs. 18, 19, 30, 1879 Colo. Sess. Laws 94, 99-100, 104; Act of Feb. 23, 1881, secs. 1, 4, 22, 1881 Colo. Sess. Laws 142, 142-43, 144-46, 154-55. The 1903 Act provided for the adjudication and administration of rights and their priorities for all beneficial uses, not just irrigation. See Act of Apr. 11, 1903, ch. 130, secs. 1, 4, 1903 Colo. Sess. Laws 297, 297, 298. The 1919 Act required adjudication of water rights; if not adjudicated, they were deemed abandoned. See Act of Apr. 9, 1919, ch. 147, secs. 1, 2, 1919 Colo. Sess. Laws 487, 487-89. The 1943 Act provided for original and supplemental adjudications for water rights to be brought in the district court where the water diversions were located. See Act of Apr. 19, 1943, ch. 190, sec. 3, 1943 Colo. Sess. Laws 613, 615. The purpose of each of these acts was to make clear that adjudication was required in order to obtain the benefits of priority administration.
The 1899 and 1943 Acts provided for changes of water rights so that the priority of the original appropriation could be maintained, subject to protecting all other water rights against injury on account of the change; thus, the right could be diverted at a different point, placed to a different use, and utilized at a different location. See Act of Apr. 6, 1899, sec. 1, 1899 Colo. Sess. Laws 235, 235-36; Act of Apr. 19, 1943, ch. 190, secs. 21-22, 1943 Colo. Sess. Laws at 628-29.
In times of short supply, water users depend on the State Engineer to curtail undecreed uses and decreed junior uses in favor of decreed senior uses.[14]See Zigan Sand & Gravel Inc. v. Cache La Poudre Water Users Ass'n, 758 P.2d 175, 185 (Colo. 1988) (holding that the State Engineer "has the authority pursuant to section 37-92-502 to order discontinuance of diversions that injure senior water rights, regardless of whether there is beneficial use"). To accomplish this, the amount and priority of rights drawing on the watershed's supply must be determined. The security and reliability of water rights turn on the enforceability of priorities when natural supply is not adequate to fill all decreed water rights and administration of decreed rights is necessary to ensure the property value of water rights. People ex rel. Simpson v. Highland Irrigation Co., 917 P.2d 1242, 1253 (Colo.1996) ("Security for the rights of Colorado water users largely depends upon the sound exercise of the Engineer's diversion curtailment enforcement power.").
Without a judgment and decree, a water right owner is not entitled to make an enforceable "call" to the state water officials for administration to curtail undecreed water uses and decreed junior rights that could intercept the water needed to satisfy the decreed senior priority. See Shirola, 937 P.2d at 749; § 37-92-301(3) (providing that distribution of water by the State and Division Engineers "shall be governed by the priorities for water rights and conditional water rights"); § 37-92-502(2)(a)(providing that "[e]ach diversion shall be evaluated and administered on the basis of the circumstances relating to it and in accordance with provisions of this article and the court decrees adjudicating and confirming water rights").

2. Out-of-Priority Diversions, Augmentation Plans and Exchanges
By the late 1960s, it became apparent to Colorado citizens and to the three branches *1150 of state government that principal river systems in Colorado, particularly the Platte and Arkansas Rivers, were reaching an over-appropriated status, and junior unadministered diversions, particularly wells depleting tributary groundwater, could be intercepting water necessary to fill senior decreed water rights. Strict application of the priority doctrine to overappropriated basins would restrict new water uses to changes of water rights. How to protect prior appropriation rights while also allowing new uses required a governmental response.
Fellhauer v. People contains this court's response to these critical issues. See Fellhauer v. People, 167 Colo. 320, 336, 447 P.2d 986, 994 (1968)("It is implicit in these constitutional provisions that, along with vested rights, there shall be maximum utilization of the water of this state. As administration of water approaches its second century the curtain is opening upon the new drama of maximum utilization and how constitutionally that doctrine can be integrated into the law of vested rights.") (emphasis in original). The 1969 Water Right Determination and Administration Act (1969 Act) contains the General Assembly's response. See Act of June 7, 1969, ch. 373 at 1200-1224. Both responses centered on: (1) reinforcing the adjudication and administration of decreed water rights in order of their priority; and (2) maximizing the use of Colorado's limited water supply for as many decreed uses as possible consistent with meeting the state's interstate delivery obligations under United States Supreme Court equitable apportionment decrees and congressionally approved interstate compacts. People ex rel. Simpson v. Highland Irrigation Co., 917 P.2d 1242, 1248, 1252-53 (Colo.1996).

(a) Augmentation Plan Approval
The General Assembly chose to implement a policy of maximum flexibility that also protected the constitutional doctrine of prior appropriation. Through the 1969 Act, the General Assembly created a new statutory authorization for water uses that, when decreed, are not subject to curtailment by priority administration. This statutory authorization is for out-of-priority diversions for beneficial use that operate under the terms of decreed augmentation plans. See Act of June 7, 1969, ch. 373, § 148-21-3(12) at 1202; § 148-21-18(1) at 1207; § 148-21-20(6) at 1210; § 148-21-21(3) & (5) at 1211; § 148-21-23 at 1212, 1969 Colo. Sess. Laws. Plans for augmentation "were a creation of the 1969 Act." David F. Jankowski et al., The 1969 Act's Contributions to Local Governmental Water Suppliers, 3 U. Denv. Water L.Rev. 20, 29 (1999).
Plans for augmentation allow diversions of water "out-of-priority while ensuring the protection of senior water rights." Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co., 33 P.3d 799, 806 (Colo.2001); Zigan Sand & Gravel Inc. v. Cache La Poudre Water Users Ass'n, 758 P.2d 175, 185 (Colo. 1988) (stating that, instead of being curtailed, "[t]he water user may choose to develop a plan for augmentation rather than discontinuing the diversion"). Decreed water rights receive a replacement water supply that offsets the out-of-priority depletions. Consol. Mut., 33 P.3d at 806 (citing § 37-92-305(5) & (8), 10 C.R.S. (2001)). We said in Midway Ranches:
Augmentation plans implement the Colorado doctrine of optimum use and priority administration, which favors management of Colorado's water resource to extend its benefit for multiple beneficial purposes. Out-of-priority diversions can occur only when a replacement supply of water, suitable in quantity and quality, is made available to substitute for the otherwise diminished amount of water available to supply other water rights exercising their priorities. Depletions not adequately replaced shall result in curtailment of the out-of-priority diversions.
Midway Ranches, 938 P.2d 515, 522 (Colo. 1997) (citations omitted); see § 37-92-305(5) & (8). The replacement water can derive from any legally available source and be provided by a variety of means. § 37-92-103(9), 10 C.R.S. (2001).[15] The augmentation plan *1151 decree identifies the structures, diversions, beneficial uses, and amount of depletions to be replaced, along with how the replacement water will be supplied and how the augmentation plan will be operated, so that the State Engineer can administer the diversions for beneficial use without curtailment.
As originally enacted in 1969, the augmentation plan statute required the water judge, not the referee, to hear applications for augmentation plans and required applicants to file their augmentation plans prior to July 1, 1971. See ch. 373, sec. 1, § 148-21-23(2), 1969 Colo. Sess. Laws 1200, 1212. The statute prohibited the filing of augmentation plan applications between July 1, 1971 and July 1, 1973 in anticipation of a rush to seek approval for this new type of water use. See ch. 373, sec. 1, § 148-21-23(3), 1969 Colo. Sess. Laws 1200, 1212. In 1971, the legislature amended the statute to repeal the suspension of the application period because the expected flood of filings had not materialized. See ch. 374, sec. 2, 1971 Colo. Sess. Laws 1334, 1334 (repealing § 148-21-23). After the repeal of the suspension, the filings began to appear in large numbers.
In 1974, in response to the desire of well users to obtain augmentation plan approval and to address the backlog created by the large number of filings, the legislature adopted Senate Bill 7 (S.B.7). See ch. 111, sec. 1, § 148-21-23, 1974 Colo. Sess. Laws 440, 440-42, (originally codified at section 148-21-23 and recodified as XX-XX-XXX). S.B. 7 allowed the State Engineer to grant temporary approval of augmentation plans if non-injurious to decreed vested water rights, provided that an application for an augmentation plan had also been filed in the water court. S.B. 7 also established State Engineer approval as prima facie evidence before the water court of a finding of non-injury, thereby affording considerable weight in determining the outcome of augmentation plan adjudication. See ch. 111, sec. 1, § 148-21-23(2), 1974 Colo. Sess. Laws 440, 440. This provision stated in part as follows:
Any person who has filed with the water clerk an application for approval of a plan for augmentation pursuant to section 148-21-18 may thereafter, at the applicant's option, submit such a proposed plan to the state engineer for his approval as a temporary augmentation plan. The state engineer shall approve such plan if he can determine with reasonable assurance that it will not injuriously affect the owner of or persons entitled to use water under a vested water right. If he determines that the proposed plan would cause such injurious effect, he shall afford the applicant or applicants an opportunity to propose protective terms or conditions. The state engineer may impose other protective terms and conditions including those specified in section 148-21-21(4). Wherever possible, the state engineer shall approve a plan for augmentation upon specifying protective terms and conditions which would permit the plan to be implemented without such injurious effect.

See ch. 111, sec. 1, § 148-21-23(2), 1974 Colo. Sess. Laws 440, 440 (emphasis added). The provision establishing approval of a temporary augmentation plan as prima facie evidence stated that:
[w]here the state engineer has approved a temporary plan for augmentation, the findings of the state engineer in support of such determination shall be prima facie evidence, unless challenged by competent countervailing evidence, that the augmentation water to be provided to the stream system is sufficient in quantity and time and that the protective terms and conditions are sufficient to prevent injury to the owner of or persons entitled to use water under a vested water right or a decreed conditional water right.
Ch. 111, sec. 1, § 148-21-23(5), 1974 Colo. Sess. Laws. 440, 441.
The General Assembly repealed the State Engineer's authority to approve temporary augmentation plans in 1977, in response to *1152 concerns about the provision's constitutionality for lack of notice to potentially injured water right holders. See ch. 483, sec. 6, 1977 Colo. Sess. Laws 1702, 1704; Kelly Ranch v. Southeastern Colo. Water Conservancy Dist., 191 Colo. 65, 550 P.2d 297 (1976).[16]
In Kelly Ranch, Southeastern Colorado Water Conservancy District (SCWCD) objected in a water court proceeding to giving effect to the State Engineer's temporary approval of the augmentation plan because the court hearings commenced prior to the adoption of S.B. 7 and because the temporary plan statute did not provide for notice to holders of adjudicated water rights that might be injured by the augmentation plan. We agreed that the State Engineer's temporary approval of the plan should not be given the prima facie effect because the court hearings commenced prior to the adoption of S.B. 7. Accordingly, we did not address the constitutionality of the State Engineer temporary approval provision, reserving it for another case. Kelly Ranch, 191 Colo. at 75, 550 P.2d at 304.
The SCWCD had argued that "in the absence of provisions for adequate notice of the State Engineer's proceeding and with the possible result of his act of approval of the plan presenting the application with proof of a prima facie case, Senate Bill No. 7 is facially unconstitutional as a violation of due process." Id. at 76, 550 P.2d at 305. We invited legislative attention to the issue: "In the absence of intervening legislative amendment as to notice we well may have to cross that bridge some future day." Id.
In response to Kelly Ranch, Senator Fred Anderson introduced Senate Bills 4 and 5 in 1977. S.B. 5 would have added procedures, including notice, to the State Engineer temporary augmentation plan approval statute, but this provision was not adopted. Instead, the legislature enacted S.B. 4, which, among other changes, repealed the authority for State Engineer approval of temporary augmentation plans. See ch. 483, sec. 6, 1977 Colo. Sess. Laws 1702, 1704 (repealing § 37-92-307).
Our fundamental responsibility in interpreting a statute is to give effect to the General Assembly's purpose and intent in enacting the statute. Martin v. People, 27 P.3d 846, 851-52 (Colo.2001). We should give effect to each word and construe each provision in harmony with the overall statutory design, whenever possible. See City of Florence v. Bd. of Waterworks, 793 P.2d 148, 151 (Colo.1990). We also consider the General Assembly's course of action and intent when enacting, amending, and repealing statutes. If different statutory provisions are in conflict or cannot be harmonized, the specific provision controls over the general provision. Martin, 27 P.3d at 852.
*1153 Specific inclusion in the statutes of State Engineer authority to approve temporary plans for augmentation, subsequent introduction of a bill to cure a potential constitutional problem of lack of notice to holders of decreed water rights who might be injured by temporary approvals, rejection of that bill, and adoption of a provision to repeal the statutory authority for State Engineer temporary approval of augmentation plans demonstrate legislative intent to consign the matter of authorizing out-of-priority diversions requiring an augmentation plan solely to the water courts.[17]
Accordingly, the current statutes do not contain a provision for State Engineer approval of out-of-priority diversions requiring augmentation plans.[18] A person desiring to divert out of priority through the device of an augmentation plan must file an application with the water court for approval. § 37-92-302(1)(a)(providing that "Any person who desires... approval of a plan for augmentation... shall file with the water clerk in quadruplicate a verified application ...."); see § 37-92-501.5 (stating that "[c]onsistent with the decisions of the water judges establishing the basis for approval for plans for augmentation" the State and Division Engineers shall have the broadest latitude to "encourage and develop augmentation plans and voluntary exchanges of water") (emphasis added).

(b) Substitute Supply
The purpose of augmentation plan adjudication is to fix the conditions under which the State and Division Engineers may allow out-of-priority diversions and depletion of the waters of a natural stream to occur consistent with the administration of decreed priorities. Midway Ranches, 938 P.2d at 522. Empire Lodge asserts that the State Engineer has broad authority to approve out-of-priority diversions in connection with a "substitute supply plan." We disagree.
The term "substitute supply" appears in section 37-92-103(9), defining the term "plan for augmentation"; section 37-92-305(5), relating to quantity and quality of replacement water under a decreed augmentation plan; sections 37-80-120(2), 37-80-120(3), and 37-80-120(4), relating to quantity of exchange water; sections 37-90-137(11)(a)(I) and 37-90-137(11)(b), providing for a court-approved augmentation plan or State Engineer-approved substitute supply plan to replace depletions from sand and gravel open mining evaporation; and section 37-80-120(5), relating to sand and gravel open mining operations.
The common nexus of these provisions is a quantity and quality requirement applicable to replacement water; if a diverter meets these requirements and alleviates injury to decreed water rights, it may take an *1154 amount of water equal to the replaced amount. The terms "substitute supply" and "replacement water" are undefined by statute but are substantially equivalent. They refer to the water supplied to decreed water rights holders under an exchange or augmentation plan. See City of Thornton v. Bijou Irrigation Co., 926 P.2d 1, 96-97 (Colo. 1996); City of Denver v. City of Englewood, 826 P.2d 1266, 1274-75 (Colo. 1992). Section 37-80-120 contains no reference to a State Engineer program for the approval of substitute supply plans, with the exception of section 37-80-120(5) pertaining to sand and gravel open mining.
The words "substitute supply" appearing in the various statutory provisions do not of themselves confer upon the State Engineer authority to authorize an out-of-priority diversion in absence of adjudication. Rather, when the General Assembly so intends, the statutory language creating such authority appears expressly. For example, sections 37-90-137(11) and 37-80-120(5) recognize State Engineer approval authority in regard to sand and gravel open mining operations. Section 37-90-137(11) states:
No person shall, in connection with the extraction of sand and gravel by open mining as defined in section 34-32-103(9), C.R.S., expose ground water to the atmosphere unless said person has obtained a well permit from the state engineer pursuant to this section. A well permit shall be issued upon approval by the water court of a plan for augmentation or upon approval by the state engineer of a plan of substitute supply . . . .
§ 37-90-137(11)(a)(I) (emphasis added).
Section 37-80-120 allows the State Engineer to permit out-of-priority storage of water in an upstream reservoir, provided that the water remains available for release to senior downstream storage appropriators in the event the water is needed for their appropriations due to insufficient supply.[19] See Purgatoire River Water Conservancy Dist. v. Kuiper, 593 P.2d 333, 339 (Colo. 1979). This provision states:
In every case in which the state engineer finds that water can be stored out of priority under circumstances such that the water so stored can be promptly made available to downstream senior storage appropriators in case they are unable to completely store their entire appropriation right due to insufficient water supply, the state engineer may permit such upstream storage out of priority, but such storage water shall be promptly released on demand of a downstream senior whenever needed by such senior for actual use.
§ 37-80-120(1) (emphasis added).
The plain language of sections 37-80-120(1) through XX-XX-XXX(4) does not establish administrative authority that parallels or provides an alternative to the water court authority for approval of out-of-priority diversions that require an augmentation plan under the 1969 Act.[20]
Our cases refer to section 37-80-120 in the context of exchanges. See City of Florence v. Bd. of Waterworks, 793 P.2d 148, 151 (Colo. 1990) (citing statutory language referring to "a proposed or existing exchange of water under section 37-80-120 or XX-XX-XXX"); (City of Thornton v. Bijou Irrigation Co., 926 P.2d 1, 91, 92, 96 (Colo. 1996) referring to exchange water quality under XX-XX-XXX(3)); see also City & County of Denver v. City of Englewood, 826 P.2d 1266, 1273-74 (Colo. 1992) (discussing exchange responsibilities); accord Santa Fe Trail Ranches, 990 P.2d at 59 n. 17 ("Nor does our holding affect the *1155 upstream storage and substitute supply provisions of section 37-80-120, 10 C.R.S. (1999). These provisions allow out of priority diversions under conditions statutorily designed to protect seniors against injury to their appropriations.").
The General Assembly added section 37-80-120 to the statutes in 1969. See ch. 370, sec. 8, 1969 Colo. Sess. Laws 1192, 1196-97. Sections 37-80-120(2) through -120(4) describe the quantity and quality criteria for the substitute supply provided through exchanges under sections 37-80-120 and 37-83-104. These subsections also provide that the senior's rights may be used for effectuating the exchange, see § 37-92-120(2); describe the water continuity and quality requirements for the substituted water, see § 37-92-120(3); and confirm that an exchange is an appropriative right. See § 37-92-120(4). The addition of section 37-80-120 in 1969 by enactment separately from the 1969 Act supplemented section 37-83-104, the pre-existing exchange statute.
In City of Florence, 793 P.2d at 151, we held that the General Assembly intended to differentiate exchanges from augmentation plans. Under section 37-83-104 and sections 37-80-120(2) through XX-XX-XXX(4), an exchange is a water management practice the State Engineer administers between decreed points of diversion. When a junior appropriator makes a sufficient substitute supply of water available to a senior appropriator, the junior may divert at its previously decreed point of diversion water that is otherwise bound for the senior's decreed point of diversion. See A-B Cattle Co. v. United States, 589 P.2d 57, 58-59, 196 Colo. 539 (1979); City of Denver v. City of Englewood, 826 P.2d 1266, 1271-72 (Colo. 1992); Fort Lyon Canal Co. v. Chew, 33 Colo. 392, 403-05, 81 P. 37 (1905). Four critical elements of an exchange are that: (1) the source of substitute supply must be above the calling water right; (2) the substitute supply must be equivalent in amount and of suitable quality to the downstream senior appropriator; (3) there must be available natural flow at the point of upstream diversion; and (4) the rights of others cannot be injured when implementing the exchange. See Casey S. Funk & Amy M. Cavanaugh, Basic Exchange 101, 1 U. Denv. Water L. Rev. 206, 207 (1998).
Justice Erickson, in his City of Florence concurring opinion, explained the primary distinction between an exchange and a plan for augmentation. The operator of an exchange may obtain a conditional or absolute decree with a priority for the exchange. The State Engineer may allow an exchange in absence of a decree confirming it. If the exchange is adjudicated, it receives the priority date of its appropriation, without application of the postponement doctrine, pursuant to section 37-92-305(10). Adjudication of an exchange assigns it a priority vis-à-vis other exchanges operating in the affected stream reach.
In contrast, an augmentation plan operates to replace depletions to the water supply of the natural stream upon which appropriations depend and allows a diversion outside of the priority system; an adjudication is required to authorize such a diversion and no priority results. As Justice Erickson said:
Although an exchange program may be adjudicated, water can be exchanged through a water exchange project administered by the state engineer without judicial approval. On the other hand, both plans for augmentation and changes of water rights must be approved by the water court.
Section 37-92-302(1)(a) separately provides for judicial approval of water exchanges apart from plans for augmentation and changes of water rights. A decreed exchange is given a priority date and is operated within the prior appropriation system. A plan for augmentation allows the operator of the plan to take water outside of the prior appropriation system and therefore a plan for augmentation does not require a priority date. A change of water right retains the priority date of the original decree subject to terms and conditions for the prevention of injury to vested water rights.
City of Florence, 793 P.2d at 156 (Erickson, J., concurring) (emphasis added; citations omitted).
*1156 We now proceed to address the standing in court of Empire Lodge and the Moyers to contest each other's water use.

B.

Undecreed Out-Of-Priority Diverter's Lack of Standing
Empire Lodge holds no conditional or absolute water right decree to fill its ponds. Empire Lodge requires but has not obtained a court-decreed augmentation plan. Nevertheless, it asserts that it has standing in water court to invoke the futile call and enlargement doctrines against the Moyers' water use.
The futile call doctrine authorizes the State or Division Engineer to lift a curtailment order originally issued for the protection of decreed water rights under priority administration, if the person whose diversion is curtailed proves that discontinuance of that diversion will not cause water to become available to senior priorities under a call for administration. See § 37-92-502(2)(a). The enlargement doctrine prohibits an appropriator from expanding its historical appropriation, for example, by developing new lands for irrigation while continuing to irrigate the lands historically irrigated under the water right. Midway Ranches, 938 P.2d at 523; Enlarged Southside Irrigation Ditch Co. v. John's Flood Ditch Co., 116 Colo. 580, 588, 183 P.2d 552, 555 (1947).
The consistent thread of Colorado law conjoining appropriation, adjudication, and administrationwhich we have reviewed in this opinionestablishes that, to have standing to challenge another's water use on the basis of an alleged injury to one's water right, the challenger must both possess a water right and obtain a decree for it. We so held in Shirola:
Absent an adjudication under the Act, water rights are generally incapable of being enforced. Once a water right has been adjudicated, it receives a legally vested priority date that entitles the owner to a certain amount of water subject only to the rights of senior appropriators and the amount of water available for appropriation. The holder of an adjudicated right is entitled to the use of a certain amount of water unless called out by senior users or unless the stream itself contains insufficient flow.
Shirola v. Turkey Canon Ranch Ltd. Liab. Co., 937 P.2d 739, 749 (Colo.1997) (citations omitted).[21]
In the absence of an adjudication decree, Empire Lodge relies for standing in court on the State Engineer's administrative decision to allow its out-of-priority diversions. At trial, counsel for Empire Lodge argued that:
when water is being diverted under the temporary plan, it is being diverted under a right which has been granted by the state engineer separate and apart from the Nelson Woods decreed right number two. And, in fact, he says the water being diverted isn't even under that [Nelson Woods] decree. It is under the temporary substitute supply plan.
Furthermore, paragraph 8 of Empire Lodge's complaint states that "[a]s a direct and proximate result of the illegal diversion and use of water by the Defendants ..., the Plaintiff has not been able to store adequate water within its reservoir[s], even though it has an approved temporary substitute water supply plan from the State and Division Engineers." Moreover, in the complaint's prayer for relief, Empire Lodge requests an order of the court "allowing Plaintiff to restore its reservoirs under the temporary substitute supply plan approved by the State and Division Engineers."
However, "[w]ithout a judicially decreed priority date, a water right owner has no right to request the Division Engineer to call out junior users in order to satisfy its own use." Shirola, 937 P.2d at 739. Administrative action, forbearance of enforcement, or State Engineer acquiescence in water use *1157 practices does not substitute for judicial determination of use rights. Santa Fe Trail Ranches, 990 P.2d at 58 (stating "the engineer's administration decisions do not determine the property rights of appropriators"). As a result of the General Assembly's 1977 amendment repealing the State Engineer's authority to grant temporary approval for augmentation plans, when the State Engineer "approved" Empire Lodge's out-of-priority diversions accompanied by a "substitute supply" of water, the State Engineer was exercising enforcement discretion and not a statutorily conferred approval authority under section 37-80-120. See, e.g., People ex rel. Simpson v. Highland Irrigation Co., 917 P.2d 1242, 1253 (Colo.1996).
Decreed prior appropriations are entitled to maintenance of the condition of the stream existing at the time of the respective appropriation. Midway Ranches, 938 P.2d at 522. Lacking an adjudication of its rights, Empire Lodge did not possess a legally cognizable right to invoke, in court, the futile call doctrine or enlargement doctrines against the Moyers' water use. These are rights that only decreed water rights holders have standing to assert. Exercise of the State Engineer's enforcement discretion does not obviate the requirement that those making water uses must obtain a decree adjudicating their rights if they desire to have standing to enforce them. See Santa Fe Trail Ranches, 990 P.2d at 58.
Had Empire Lodge proceeded through a conditional or absolute water right proceeding or through an augmentation plan proceeding, or both, it could have raised the enlargement issue in two ways. In a proceeding for adjudication of a conditional or absolute water right, it could have sought to demonstrate that unappropriated water was available for its appropriation were it not for an illegal enlargement of the Moyers' water right. In a proceeding for adjudication of an augmentation plan, it could have sought to demonstrate that the Moyers' demand for replacement water to its decreed water right is not justified, in whole or part, due to an illegal enlargement.[22]
The Moyers, on the other hand, had standing to allege injury to their decreed water right due to Empire Lodge's out-of-priority diversions and to seek an injunction to curtail Empire Lodge's out-of-priority diversions. The Moyers' counterclaim alleged that "Plaintiff Empire has physically diverted and stored water in an inappropriate and illegal manner causing injury to defendant Moyers in restricting the amount of water flowing to their property." Thus, the Moyers invoked a decreed water right and alleged injury to that right, sufficient for standing purposes to contest Empire Lodge's undecreed water use. See Shirola, 937 P.2d at 747 (recognizing that standing to assert injury to a water right requires a legally protected interest in a vested water right or a conditional decree, except that the State and Division Engineers have broad standing under the Act to allow them to fulfill their statutory duties).[23]
The Water Court correctly dismissed Empire Lodge's claims for lack of standing and properly considered the Moyers' claims. We now proceed to the Water Court's judgment.

C.

The Water Court's Judgment
The Water Court's judgment enjoined Empire Lodge from making its out-of priority diversions absent adjudication of an augmentation plan. Empire Lodge contends that the Water Court erred in issuing its judgment because the Moyers did not actually *1158 prove injury to their water right; instead, Empire Lodge argues, the Water Court relied on a presumption of injury to water rights depending for their supply on Arkansas River water. But this presumption of injury is established in our case law. See, e.g., Shirola, 937 P.2d at 745 (Colo.1997); Kelly Ranch v. Southeastern Colo. Water Conservancy Dist., 191 Colo. 65, 71, 550 P.2d 297, 301 (1976); Fellhauer v. People, 167 Colo. 320, 325, 447 P.2d 986, 988-89 (1968). In addition, the State Engineer testified in this case that Empire Lodge's out-of-priority diversions for the two ponds cause loss by evaporation to the water supply upon which decreed Arkansas River water rights depend. The record shows the depletions to the Arkansas River system to have been approximately forty acre-feet per year.
Empire Lodge asserts that its pond filling activities were accomplished through operation of an exchange. We disagree. Water from Empire Lodge's replacement source, Twin Lakes Reservoir, entered the stream below the Moyers' diversions. Facts in the record support the occurrence of injury to the Moyers' water right by Empire Lodge's out-of-priority diversions. The State Engineer's Office so recognized in its June 25, 1992 letter to Empire Lodge:
Our records indicate that the Empire Creek Ditch, located on Empire Gulch below the Nelson Woods No.2 ditch, has a water right senior to the applicant. This ditch would not benefit from releases out of Twin Lakes Reservoir.
This letter also states that Empire Lodge's pond-filling requires an augmentation plan. The State Engineer's Office directs Empire Lodge to "[d]iligently attempt to obtain a Water Court approved plan of augmentation to provide a permanent source of replacement water for the lakes." The trial of this case included evidence that Empire Lodge's water use practices required an augmentation plan under the 1969 Act. In reference to correspondence between the State Engineer's Office and Empire Lodge, Division Engineer Witte testified as follows:
Q. Okay. Would you agree thatwould you agree that paragraph one in that required Empire to obtain an approved plan of augmentation to replace these out-of-priority depletions of Beaver Lakes?
A. I believe that is correct.
Q. Okay. And isn't it true, sir, to the best of your knowledge, that the applicant, Empire, never, in fact, submitted such or got approval for such augmentation plan?
A. I believe that is correct.
The State Engineer and the Water Court both found that Empire Lodge's pond filling activities, in light of their impact on the Moyers' rightas well as impact on the Arkansas River supply upon which other decreed water rights dependrequired adjudication of an augmentation plan; based on the record, we agree. Although the State Engineer believed that subjecting Empire Lodge's pond-filling activities to the Moyers' call might alleviate the need to provide replacement water to the Moyers' right, it was the Moyers' exercise of calls that caused Empire Lodge to file this lawsuit.
The adjudication statutes do not contemplate an undecreed out-of-priority diverter suing the holder of a decreed water right over an issue of alleged injury to the undecreed diverter. Had Empire Lodge filed an augmentation plan application with the water court, the issue of whether substituted water under section 37-92-305(5) must be supplied to the Moyers' right, so that Empire Lodge could fill the ponds out of priority, would have been adjudicated under section 37-92-305(8), and the current lawsuit avoided.
The change of water right and augmentation plan statutes provide that applications for approval of the water use practices they encompass are mandatory, not discretionary. They are designed to provide notice and the opportunity for potentially affected decreed water rights holders to participate in proceedings in order to protect their rights. See Farmers High Line Canal & Reservoir Co. v. City of Golden, 975 P.2d 189, 197 (Colo.1999); Santa Fe Trail Ranches, 990 P.2d at 55. The purpose of these adjudication proceedings is not to confirm an undecreed pre-existing change of water right or out-of-priority diversion, but rather to: (1) authorize, deny, or condition the change of *1159 water right or the out-of-priority diversion; and (2) allow water rights holders like the Moyers to assert and protect their decreed water rights. Section 37-92-305(8) is detailed and specific about the water court's role and the right of potentially affected decreed water rights holders to be heard in connection with out-of-priority diversions requiring an augmentation plan. It states that:
In reviewing a proposed plan for augmentation and in considering terms and conditions that may be necessary to avoid injury, the referee or the water judge shall consider depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water that would be provided by the applicant, and the existence, if any, of injury to any owner of or persons entitled to use water under a vested water right or a decreed conditional water right. A plan for augmentation shall be sufficient to permit the continuation of diversions when curtailment would otherwise be required to meet a valid senior call for water, to the extent that the applicant shall provide replacement water necessary to meet the lawful requirements of a senior diverter at the time and location and to the extent the senior would be deprived of his or her lawful entitlement by the applicant's diversion. A proposed plan for augmentation that relies upon a supply of augmentation water, which, by contract or otherwise, is limited in duration shall not be denied solely upon the ground that the supply of augmentation water is limited in duration, so long as the terms and conditions of the plan prevent injury to vested water rights. Said terms and conditions shall require replacement of out-of-priority depletions that occur after any groundwater diversions cease. Decrees approving plans for augmentation shall require that the state engineer curtail all out-of-priority diversions, the depletions from which are not so replaced as to prevent injury to vested water rights.
§ 37-92-305(8), 10 C.R.S. (2001).
In light of the General Assembly's action in repealing State Engineer approval authority for augmentation plans, the Water Court's injunction had the effect of directing Empire Lodge to obtain court approval for its out-of-priority diversions that require an augmentation plan decree authorizing them, and the Moyers had standing to seek such relief. It is the role of the General Assembly, not the State Engineer or the courts, to provide amendments to the current statutes if additional State Engineer approval authority is desirable.
Empire Lodge complains that the injunction the Water Court issued prohibited it from storing water in its ponds in all situations, even under "free river" conditions when the river is free from calls due to ample supply. It also complains that the injunction prohibited it from appropriating unappropriated water. We do not construe the Water Court's judgment to so provide.
The Water Court limited its findings to those pertinent to establishing the basis for its order enjoining Empire Lodge's out-of-priority diversions in the absence of augmentation plan adjudication; it did not consider evidentiary and factual determinations that would be properly associated with the augmentation proceeding itself. The Water Court found:
The Association purports to remain committed to an augmentation plan, but the Court infers that because of its relative impecunious state and/or disagreement of its members, it has failed and will continue to fail to meaningfully pursue an augmentation plan until forced to by this court.
The Water Court also found that, over the course of twelve years, Empire Lodge had been aware of the requirement to obtain court-approval of a decree authorizing its out-of-priority diversions. The Water Court concluded that there was "no end in sight to an ongoing situation where an augmentation plan is known to be necessary" and Empire Lodge "has taken no meaningful steps or has no ability to acquire permanent rights."[24]
*1160 We therefore construe the injunction as enjoining only Empire Lodge's out-of-priority diversions that require a decreed augmentation plan authorizing them.[25] This is the plain import of the Water Court's findings, which is underscored by the Water Court's finding that the State Engineer first placed Empire Lodge on notice in 1986 that its pond-filling activities required an augmentation plan adjudication through the water court. The Water Court did not err in its judgment.

III.
Accordingly, we affirm the Water Court's judgment.
NOTES
[1] Empire Lodge lists eleven issues on appeal:

1. Whether the Water Court's ruling prohibiting Empire Lodge Homeowners' Association (hereinafter Empire) from making any future appropriations of water from Empire Creek to its Reservoirs, without a Water Court approved augmentation plan, violates Colo. Const., art. XIV, § 6.
2. Whether the Water Court erred as a matter of law in determining that the Moyers' irrigation practices were in accordance with their decreed entitlement under the Empire Creek Ditch Decree (hereinafter Decree).
3. Whether the Moyers' current usage of their portion of the Decree for irrigation is in excess of their water right under that decree and should be enjoined to restrict irrigation to a maximum of 245 acres as required by the Decree.
4. Whether the Moyers' current diversions under their water right exceeded the decreed duty of water for irrigation authorized under the Decree and should be restricted.
5. Whether the Moyers' diversions to storage and domestic uses violates the terms of the Decree and should be restricted.
6. Whether the Moyers have standing to challenge the legality of Empire's Substitute Supply Plan (hereinafter SSP) absent any showing of injury to their decreed water right.
7. Whether the Water Court's finding that Empire's SSP caused injury to the Arkansas River was supported by adequate evidence in the record.
8. Whether the Water Court erred in its conclusion that injury to senior water rights can be "presumed to occur" due to Empire's failure to adjudicate a plan for augmentation.
9. Whether, absent evidence of injury caused by operation of the SSP, the Water Court had authority to substitute its judgment for that of the State Engineer and enjoin the operation of the SSP.
10. Whether the Water Court erred in determining that Empire's SSP was in violation of C.R.S. § 37-80-120 and that the State Engineer abused his discretion in approving Empire's SSP.
11. Whether the Water Court employed the proper standard of review in its evaluation of the State Engineer's administrative decision to approve Empire's SSP and whether the Water Court employed the proper standard of review of the State Engineer's administration that no injury to senior water rights would result from operation of Empire's SSP.
[2] The decree states that "the said Nelson Woods is entitled to the continuous use of one and one fourth ... cubic feet of water per second of time through said Nelson Woods No. 2 ditch from Nelson Spring and Empire Gulch Creek, by reason of diverting, appropriating and using water through the same for irrigating and domestic purposes and that said appropriation and use dates from April 29 A.D. 1891." The decree also establishes that "the petitioner, Nelson Woods, is entitled to divert water for irrigation and domestic purposes, from Nelson Spring and Empire Gulch Creek, a tributary of the Arkansas River in Lake County, State of Colorado." The decree then provides the legal description for the land on which the irrigation water is to be applied.
[3] The natural surface water and groundwater system of the Arkansas River is severely over-appropriated, resulting in early and prolonged calls for administration in most years. See Shirola v. Turkey Canon Ranch Ltd. Liab. Co., 937 P.2d 739, 745 (Colo.1997); Kelly Ranch v. Southeastern Colo. Water Conservancy Dist., 191 Colo. 65, 71, 550 P.2d 297, 301 (1976); Fellhauer v. People, 167 Colo. 320, 325, 447 P.2d 986, 988-89 (1968).
[4] Empire Lodge received State Engineer approval for its out-of-priority diversions seven times during this period.
[5] "A call is placed on a river when a senior appropriator forces upstream juniors to let sufficient water flow to meet the requirements of the senior priority." USI Props. E., Inc. v. Simpson, 938 P.2d 168, 171 n. 2 (Colo.1997).
[6] The Empire Creek Ditch Decree states in full:

That said ditch is entitled to Priority No. 34. It is claimed by H.W. Lord. It is used for the irrigation of lands, and 320 acres of land proposed to be irrigated thereby. The bed of said Empire Creek is used as the main ditch, and divers lateral ditches taking water therefrom to irrigate the S. ½ of the N.W. ¼ and N. ½ of the S.W. ¼ and the S.E. ¼ of the S.W. ¼ of Sec. 15 and N.E. ¼ of the N.W. ¼ and W. ½ of the N.E. ¼ of Sec. 22 Tp. 10 S.R. 80, W., Lake County Colorado.
And it is hereby and [sic] adjudged and decreed that there be allowed to flow into said ditch and lateral ditches from said Creek, for the use aforesaid, and for the use and benefit of the party or parties lawfully entitled thereto, under and by virtue of appropriation by construction and Priority No. 34, so much water as will flow therein to the amount of six and four-tenths cubic feet of water per second of time, the appropriation of which water took effect on, and said priority No. 34 dates from the thirty-first day of December, A.D. 1871. Provided, that the amount of water shall only be granted and allowed to flow into said ditch from the said Creek, for the use and benefit aforesaid, in the proportion of one cubic foot of water per second of time to 50 acres of land irrigated therefrom.
[7] A futile call determination lifts curtailment of diversions that would otherwise result from administration of decreed priorities. The junior water rights holder must demonstrate that shutting down the junior right has not made water available to help satisfy the calling senior's water right. See § 37-92-502(2)(a), 10 C.R.S. (2001) (stating that if "a discontinuance has been ordered pursuant to the provisions of this paragraph (a), and nevertheless such discontinuance does not cause water to become available to such senior priorities at the time and place of their need, then such discontinuance order shall be rescinded").
[8] The Lake County lawsuit ran parallel to the case at issue here, sharing exhibits and findings in order to facilitate the resolution of the dispute in its entirety.
[9] Congress recognized the authority of the territories and states to establish rights to unappropriated water under their own laws; the western states chose prior appropriation as their basic water allocation and administration law for waters of the natural stream. See California v. United States, 438 U.S. 645, 662, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); Cal. Or. Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 163-64, 55 S.Ct. 725, 79 L.Ed. 1356 (1935); State v. Southwestern Colo. Water Conservation Dist., 671 P.2d 1294, 1304-08 (Colo.1983); Coffin v. Left Hand Ditch Co., 6 Colo. 443, 447, 449 (1882).
[10] Over an extended period of time, a pattern of historic diversions and use under the decreed right at its place of use will mature and become the measure of the water right for change purposes, typically quantified in acre-feet of water consumed. Midway Ranches, 938 P.2d at 521.
[11] As knowledge of the science of hydrology advanced, it became clear that natural streams are surface manifestations of extensive tributary systems, including underground water in stream basins. Three Bells Ranch Assocs. v. Cache La Poudre Water Users Ass'n, 758 P.2d 164, 170 (Colo.1988). Designated groundwater, non-tributary groundwater, and Denver Basin groundwater, however, are allocated and administered under a system that differs from the allocation and administration of the natural stream system. See generally Upper Black Squirrel Creek Ground Water Mgmt. Dist. v. Goss, 993 P.2d 1177 (Colo. 2000).
[12] See Winters v. United States, 207 U.S. 564, 577, 28 S.Ct. 207, 52 L.Ed. 340 (1908); Bd. of County Comm'rs v. Crystal Creek Homeowners' Ass'n, 14 P.3d 325, 333 (Colo.2000).
[13] When first joined in a state proceeding under the McCarran Amendment, 43 U.S.C. § 666 (2001), federal agencies and tribes obtain for their water rights the original date of their reservation or appropriation; delay in adjudicating the rights past the first available adjudication results in postponement of the priority. United States v. Bell, 724 P.2d 631, 642 (Colo.1986).
[14] In contrast to short supply conditions, "free river" conditions occur when there is sufficient natural supply to satisfy all water uses, whether decreed or undecreed, and State Engineer administration is unnecessary for the protection of decreed water rights.
[15] Section 37-92-103(9) provides that a plan for augmentation is:

a detailed program, which may be either temporary or perpetual in duration, to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means.
§ 37-92-103(9), 10 C.R.S. (2001).
[16] Kelly Ranch involved an augmentation plan application for three proposed subdivisions. The State Engineer approved a temporary plan for augmentation under the authority of S.B. 7 after hearings had commenced in the Water Court on the application for an augmentation plan decree. The source of augmentation water under the plan was an 1874 irrigation right which historically irrigated the Kelly Ranch. The plan proposed to remove lands from irrigation, store the historic consumptive use water, and release it as needed to replace the out-of-priority depletions resulting from subdivision water use. The Water Court ruled that the plan could not be approved because it did not add new water into the water system. Disagreeing with the Water Court, we held that "new water need not be injected to give life and validity to a plan for augmentation." Kelly Ranch v. Southeastern Colo. Water Conservancy Dist., 191 Colo. 65, 74, 550 P.2d 297, 303 (1976).

We observed that the statutory definition of a plan for augmentation, set out in section 37-92-103(9), included a number of alternatives for providing the necessary replacement water, such as water exchange projects, substitute supplies of water, development of new sources of water, or other appropriate means. Id. at 74, 550 P.2d at 303-04. We pointed out that our decision in Fellhauer and the General Assembly's enactment of the 1969 Act contemplated new methods of allowing water uses which could not occur under a strict regime of priority enforcement in over-appropriated watersheds:
The fact that the rivers involved are over-appropriated, rather than being an argument against the plans, is the very reason for the valid exercise of ingenuity of persons seeking to maximize the use of water, whether they are present or future owners of land and wells, developers, or, as characterized by the Water Court here, promoters, speculators or non-users.
Id. at 74-75, 550 P.2d at 304.
[17] As a result of this action by the General Assembly, when the State Engineer subsequently approved Empire Lodge's out-of-priority diversions in recognition that a "substitute supply" of water would likely prevent injury to water rights, the State Engineer was exercising enforcement discretion and not statutory approval authority under section 37-80-120 when the out-of-priority diversion required an augmentation plan. See, e.g., People ex rel. Simpson v. Highland Irrigation Co., 917 P.2d 1242, 1253 (Colo.1996). Exercise of enforcement discretion does not alleviate the duty of those making such water uses to obtain a decree for an augmentation plan. It is the role of the General Assembly, not the State Engineer or the courts, to provide amendments to the current statutes if additional State Engineer administrative authority is desirable. See, e.g., § 37-80.5-104(1)(a)(IV), 10 C.R.S. (2001) (providing that, in compliance with rules promulgated for the Arkansas River water bank pilot program, leases, loans, and exchanges effectuated through the bank need not be adjudicated). We also acknowledge the State Engineer's administrative authority to regulate wells upon promulgation of rules for a river basin or aquifer, subject to a water court review proceeding, under section 37-92-501.
[18] Commentators have observed the effect of the 1977 repeal of the State Engineer's temporary augmentation plan approval authority. See, e.g., James N. Corbridge, Jr. & Teresa A. Rice, Vranesh's Colorado Water Law 157 (rev. ed. 1999) ("Prior to 1977, special procedures were provided for approval of plans for augmentation. Approval for temporary plans could be obtained from the state engineer if it were possible to devise terms and conditions that would allow the state engineer to determine, with reasonable certainty that the plan would not injuriously affect vested rights. However, plans for augmentation are now treated the same as any other water matter and are governed generally by the rules established for matters before the water court.") (footnotes omitted).
[19] The 1897 Act authorized exchanges of water between reservoirs and ditches. See Act of Apr. 9, 1897, § 4, 1897 Colo. Sess. Laws at 177. This provision continued through subsequent enactments; its current form is contained in both sections 37-80-120(2) through XX-XX-XXX(4) and XX-XX-XXX.
[20] Consistent with the view we express in this opinion, a commentator has described section 37-80-120(1) as a water management tool involving storage appropriators:

The amendment allows the state engineer to permit out-of-priority, upstream storage of water, provided the stored water can be promptly supplied to downstream storage appropriators with an insufficient water supply. An adequate substituted supply is deemed by statute to satisfy the senior appropriative right-the essence of a physical solution.
Harrison C. Dunning, The "Physical Solution" in Western Water Law, 57 U. Colo. L.Rev. 445, 468 (1986).
[21] In Shirola, we noted an express statutory exception to this general rule for certain small capacity wells under section 37-92-602(4). The General Assembly established vested water rights for such wells based on a presumption of no material injury and conferred upon the well owners a "legally protected interest in his or her vested water right merely by filing an application for adjudication of such well." Shirola, 937 P.2d at 750. This exception does not apply here.
[22] Empire Lodge informed us during oral argument that it has initiated a water court adjudication action to determine its rights in regard to its water use; thus, it has a context for raising issues of enlargement and other pertinent factual and legal matters. We determine that the Water Court's judgment in this case does not operate to prevent Empire Lodge from appropriately raising and litigating the enlargement issue. In its conclusions of law, the Water Court recognized that equitable relief is available in some situations, "upon appropriate proof, to remedy expanded usage which injures other decreed appropriations."
[23] Our decision in Shirola also recognized standing in members of the public to file objections to water court applications for the purpose of putting applicants to their required proof. See Shirola, 937 P.2d at 747.
[24] While the Water Court was correct in ruling that Empire Lodge must obtain "permanent rights" to operate its out-of-priority diversion, it misspoke when suggesting the need for a "permanent source" of augmentation water in connection with Empire Lodge's required augmentation plan. Section 37-92-305(8) provides that an augmentation source may employ leased or contract water, for example, so long as terms and conditions of the plan prevent injury to vested water rights. Curtailment of all out-of-priority diversions whose depletions are not replaced is the ultimate safeguard provided under section 37-92-305(8).
[25] The trial court, while it expressed concerns about the State Engineer substitute plan practices, did not issue an injunction any broader than necessary to enjoin Empire Lodge's out-of-priority diversions into its fishing and recreation ponds.